# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **SHARON ROBERTS,** | ) | |
| **Plaintiff,** | ) | **Case No. 14 C 442** |
| | ) | |
| **v.** | ) | **Judge Joan B. Gottschall** |
| | ) | |
| **ADVOCATE HEALTH CARE,** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sharon Roberts is a former employee of Advocate Illinois Masonic Medical Center who worked as a registered nurse team lead in the Cardiac Catheterization Lab from September 2009 to March 2013.[1]  She contends that Advocate violated the Fair Labor Standards Act ("FLSA") and the Illinois Minimum Wage Law ("IMWL") by failing to pay her for all of the overtime work that she performed.  Advocate seeks summary judgment on both claims.  For the following reasons, Advocate's motion is granted in part and denied without prejudice in part.

## I. BACKGROUND

### A.    Local Rule 56.1

Advocate filed a reply in support of its Local Rule 56.1 statement.  (Dkt.38.)  "This is a procedurally improper attempt to have the last word in a manner that is not contemplated by the local rules."  *Killis v. Cabela's Retail II, Inc.*, No. 13 C 6532, 2015 WL 128098, at *1 (N.D. Ill.

---

[1]  Roberts sued Advocate Health Care.  In its answer to Roberts' complaint, Advocate Health Care "denies that Plaintiff worked for Advocate Health Care.  Advocate admits that Plaintiff worked for Advocate Illinois Masonic Medical Center."  (Answer, Dkt. 11, at 5.) Nevertheless, Advocate Health Care does not claim that Roberts sued the wrong defendant so Advocate has waived any such argument.  Accordingly, the court will assume that the two Advocate entities are related in a way that makes Advocate Health Care the proper defendant. For the sake of simplicity, the court will refer to the defendant as "Advocate."

Jan. 8, 2015) (collecting cases). Thus, the court will not consider Advocate's reply in support of its statement of facts.

With respect to Robert's response to Advocate's statement of facts, the court has broad discretion when enforcing the local rules governing summary judgment motions. *See*, *e.g.*, *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014). First, some of Roberts' so-called denials fail to demonstrate that the factual assertions at issue are disputed. For example, Roberts takes issue with ¶ 16 of Advocate's statement of facts, which provides:

> When an employee is not on shift or on-call, she is not expected to respond to any page, whether cardiac emergency or otherwise. (Magurany Dep. 50:21-51:5, 85:9-22, 159:16-24.) Ms. Magurany [Roberts' supervisor] instructed [Roberts] that "It's my expectation that if you're not on-call, turn your pager off. You do not need to look at or answer e-mails. Nothing is that urgent. The only urgent thing in the cath lab is the cardiac alert. So that we give to people that are on-call." (Ex. B/Magurany Dep. 159:16-24.)

Roberts asserts that the quoted deposition testimony does not support the first sentence, but it appears to do so, and Roberts does not cite to any evidence that supports her denial. Merely saying that a fact is disputed does not transform it into a disputed issue of fact sufficient to survive a motion for summary judgment. *See Hurst v. Mauger*, No. 11 C 8400, 2013 WL 1686842, at *2 (N.D. Ill. Apr. 16, 2013). This problem appears repeatedly in Roberts' response to Advocate's facts as numerous facts are purportedly disputed although the evidence cited by both Advocate and Roberts supports Advocate's statement of fact. The court will disregard all denials of facts by Roberts that are fairly supported by the cited evidence.

Advocate is also guilty of improper denials as in its response to Roberts' statement of additional facts, it repeatedly states that facts are "disputed in part, but immaterial." Some of Advocate's responses explain why Advocate believes that the cited testimony is inaccurate and

include citations to the record. However, it is not always clear why Advocate believes that certain portions of Roberts' facts are unsupported by the record. For example, in response to ¶ 9 of Roberts' statement of additional facts, Advocate asserts that it is "[d]isputed but immaterial that Ms. Magurany was responsible for making the final approval of work schedules for members of her team as unsupported by the cited testimony." The cited testimony provides "Q: Was it one of your duties and responsibilities as manager of cardio to review and make the final approval or work schedules for members of your team" A: Yes." (Magurany Dep. at 91:21-92-1.)

Advocate's practice of marking the vast majority of facts as "disputed" in whole or in part when they are not disputed is at odds with the local rules governing summary judgment, which are supposed to streamline proceedings, not provide a platform to disagree reflexively with the position of the opposing party. As with Roberts' improper denials, the court will disregard denials by Advocate where the facts at issue are fairly supported by the cited evidence.

Turning back to Roberts' responses to Advocate's facts, she include numerous types of unresponsive denials. For example, in ¶ 26 of Advocate's statement of facts, Advocate asserts that Roberts "worked a total of 331.74 hours of overtime work over the [statutory] period." Roberts denies this fact and states that "she worked, on average, approximately 8 to 12 hours of unpaid overtime hours each workweek during her employment with Advocate." The court understands that Roberts' position is that she was not paid for all of the overtime hours that she worked. But her overtime hours are not limited to the claimed additional 8 to 12 hours. She has not denied that she also worked 331.74 overtime hours as posited by Advocate and as shown by the evidence cited by Advocate. She also does not cite to any record evidence that demonstrates

that a dispute exists. *See* Loc. R. 56.1(b)(3)(B)-(C). The court will disregard this type of unresponsive denial. *See id.*

Next, numerous responses to Advocate's facts state that Roberts "admit[s] that according to the data produced by Defendant," Advocate's statement of fact is true. *See*, *e.g.*, Roberts' response to ¶ 47 of Advocate's statement of facts. To the extent that this is an attempt to contest the fact asserted by Advocate, it is unavailing. Advocate's corresponding facts are deemed admitted. *See Patterson v. Burge*, No. 03 C 4433, 2010 WL 3894438, at *3 (N.D. Ill. Sept. 27, 2010). Similarly, to the extent that Roberts ends a response to one of Advocates' statements of fact with the phrase "[d]eny the rest" without providing a citation to the record, Advocates' fact is deemed admitted. *See* Loc. R. 56.1(b)(3(C); *see also Cardoso v. Cellco P'ship*, No. 13 C 2696, 2014 WL 6705282, at *2 (N.D. Ill. Nov. 26, 2014).

Finally, Roberts attempts to challenge statements she made during her deposition by generally citing multi-page documents without providing pinpoint citations. For example, ¶ 70 of Advocate's facts quotes Roberts' deposition testimony about the disputed overtime: "I can't break it down, but I do know it was about 8 to 12 per week." In her response to ¶ 70, Roberts states (again) that she estimates that she worked approximately 8 to 12 hours of uncompensated overtime per pay period and in support, cites to *thirty* instances where she made this claim in some fashion during her deposition. She also cites to Magurany's deposition testimony that Magurany understood that she was seeking 8-12 hours of overtime per week. None of this refutes Advocate's statement of fact in ¶ 70 that Roberts herself could not break down her claimed overtime past her estimate of 8 to 12 hours per week.

Roberts' response, however, continues. Roberts asserts that "[d]ocumentation of emails, pages and text messages support her claims that there is time that she worked for Defendant but was not properly compensated." She then cites to multiple group exhibits; specifically, "Exhibit D/Emails Outside Plaintiff's Scheduled Shift; Exhibit E/Time Records Corresponding to Emails Outside of Plaintiff's Scheduled Shift; Exhibit F/Emails Issued Over the Lunch Timeframe; Exhibit G/Pages Outside of Plaintiff's Scheduled Shift; Exhibit H/Time Records Corresponding to Pages Outside of Plaintiff's Scheduled Shift; Exhibit I/Pages Issued Over the Lunch Timeframe[]." None of these exhibits refute Roberts' own statement under oath that she could not "break . . . down" when she worked overtime without compensation. At best, they could only support her claim that she worked unpaid overtime. Roberts thus cannot disclaim her prior sworn statement that she could not break down her alleged unpaid overtime work.[2]

With these rulings in mind, the court turns to the parties' Rule 56.1 submissions.

**B.     Facts**

**1.     Roberts' Position as a Nurse and Clinical Team Lead**

In September 2009, Roberts began working for Advocate Illinois Masonic Medical Center as a registered nurse and clinical team lead in the Cardiac Catheterization Lab ("Cath Lab"). Advocate terminated Roberts' employment in March 2013.[3] At the relevant time, Kathleen Magurany (manager of cardiac services) was Roberts' direct supervisor and Karen Kittle (director of nursing and clinical operations) was Magurany's direct supervisor.

---

[2] Roberts' citations to groups of email, pager, and text records to support her claims are discussed below.

[3] The parties dispute why Advocate terminated Roberts' employment but the reason is irrelevant to the claims raised in this lawsuit.

During Roberts's tenure with Advocate, Magurany supervised approximately 45 to 50 other employees, including nurses and radiologic technologists (staff who perform diagnostic imaging examinations) in multiple departments. Magurany reviewed employee time cards a "couple times a week." (Magurany Dep. at 90: 3-4.) She was responsible for making final decisions regarding employee time cards and clock adjustment forms for members of her team. She approved 100% of her team's clocking adjustment forms because she trusted them to report time, including missed or interrupted lunches, accurately.

Staff at Advocate's Cath Lab perform cardiac interventions and diagnostic procedures. Some of the work performed at the Cath Lab, such as addressing heart attacks, is time-sensitive. As a clinical team lead in the Cath Lab, Roberts performed clinical duties and was responsible for the unit's day-to-day operations. In this role, she ensured that the Cath Lab had enough nurses on each shift, scheduled the daily employee lunches, and facilitated time record corrections for other employees by adding hours in Advocate's time and attendance system if an employee failed to use the time clock properly.

Advocate issued a pager for Roberts' use when she was on shift at the hospital or was on-call. If a patient had a cardiac emergency, a "cardiac alert" page was sent to all Cath Lab employees. According to Magurany, all employees working a shift and on-call employees were expected to help with the emergency patient.

Cath Lab employees also use pagers to communicate non-emergency issues. When employees are working a scheduled shift, there is no set time by which staff must respond to non-emergency pages but they are expected to respond, generally within a day. For pages dealing with patient care issues, Roberts was expected to answer her page "within minutes" if

she was working and not taking her lunch break. (*Id*. at 38:18- 40:12.) When employees are not working a shift and are not on-call, Magurany's "expectation" was that they should turn off their pagers and not "look at or answer e-mails. Nothing is that urgent. The only urgent thing in the cath lab is the cardiac alert. So that we give to people that are on-call." (*Id*. at 159:16-24.)

In addition to her pager, Roberts carried a portable phone when she was on duty at the hospital. Advocate supplies these phones so team leads can place calls in response to emergency pages or request assistance if a corded phone is unavailable. The portable phone was only operable inside the hospital so Roberts stored it in the Cath Lab when she finished her shift for the day. Magurany expected Roberts to give her portable phone to another employee during lunch breaks so Roberts could take a thirty-minute break. Roberts, however, testified at her deposition that she kept her portable phone and pager with her during lunch breaks in case someone needed to reach her. According to Kittle, although Advocate's policy called for staff to hand off their responsibilities during lunch breaks, Advocate did not have a formal policy about turning off communication devices during breaks and thus allowed staff to decide whether to turn their devices off while taking a break.

Besides the pager and the portable phone, Magurany communicated with her staff, including Roberts, via email. She periodically sent emails outside regular business hours so the emails would be waiting when staff clocked in the following day as she did not expect staff to check their work email or respond if they were off the clock. As Magurany explained, "My expectation is that the associates check their e-mails at least once daily when they're punched in, because once I send stuff at night, then it's ready for them in the morning." (*Id*. at 76:2-5.)

Magurany believed that "if somebody is doing work outside of work, they should be punched in." (*Id*. at 74:16-20.)

Roberts testified that messages sent to her work pager would also go to her personal cell phone. According to Kittle (Magurany's supervisor), this occurred because Roberts set up the pages to forward to her cell phone. (Kittle Dep. at 50:8-51:10.) Advocate contends that Roberts received approximately 24 pages outside of her work hours over the course of twenty-one months.

The summary judgment record contains a voluminous collection of email, pager, and text message records. Roberts claims that these records support her unpaid overtime claim. Advocate raises a host of objections to these records. For example, it notes that Roberts' evidence includes emails from when she was paid to be on-call, emails that Roberts responded to when she was clocked in, and emails that fall into a three and a half hour block during which Roberts contends that her thirty-minute lunch could have been taken.

## 2. Roberts's Schedule and Work Hours

Cath Lab hours are Monday through Friday from 6:30 a.m to 5:00 p.m. The lab also is available for after hours procedures, which are covered by a rotating team of Cath Lab employees. Roberts typically worked Monday through Friday from 7:00 a.m. to 3:30 p.m. and rotated covering on-call shifts during the week and on weekends. In addition, at some point in 2012, Roberts began to work additional shifts in the Pediatrics Unit. While the parties disagree about the average amount of overtime Roberts worked and whether Roberts performed unpaid overtime work, it is undisputed that Advocate paid her consistently for on-call time and overtime that Roberts claimed that she worked.

Magurany expected staff, including Roberts, to take a thirty-minute uninterrupted meal break.  Roberts did not need to punch out for lunch unless she left the hospital premises when she was on break.  During her deposition, Roberts explained that if an employee misses a meal period or is interrupted for work reasons, she could receive payment for the missed or interrupted meal period by "sign[ing] into the computer, bring[ing] up your name and then add a clocking of no lunch and then save it."  (Roberts Dep. at 44:10-19, 45:15-18.)   Roberts was aware of this procedure due to training provided by Advocate and used this feature periodically.  When Roberts used the "no lunch" code, Advocate paid her for her missed or interrupted lunch.

Magurany's office was on the path Roberts took when she left work for the day.  Roberts contends that Magurany called her in for impromptu meetings lasting approximately thirty minutes on a "consistent" basis, meaning "at least" four times per week.  (*Id*. at 56:11-19, 62:19-63:3.)  Roberts testified that she could have clocked out after these conversations took place but did not do so because she did not know if Magurany would stop her on her way out.  Roberts did not use any of the mechanisms available to her to correct the time allegedly spent meeting with Magurany after Roberts' shift ended.

It is undisputed that Roberts worked and was paid for overtime during the statutory period, as Roberts received overtime pay in 70 of the 113 weeks during the statutory period.  However, Roberts contends that she worked additional overtime without compensation.

### 3.     Roberts' Utilization of Advocate's Timekeeping Procedures

Advocate employees punch in before beginning work and punch out at the end of their work day.  If an employee works hours that do not correspond to her punch information, she can use a computerized system the next morning to correct her punch times.  Employees can also

correct inaccurate punch times (for example, a day when the employee worked through lunch but failed to enter the missed lunch code into the timekeeping system) by submitting a payroll adjustment form.  Advocate allows employees to submit a payroll adjustment form to receive payment for time worked at any time; there is no cut-off running from the time the work was performed.  Employees also can report uncompensated time to Advocates' human resources staff, who will then correct any payroll discrepancies.

Although Roberts denies that she ever read Advocate's "Pay Period, Direct Deposit and Paystubs policy," which lists methods by which employees can ensure that they are paid for time worked, at her deposition, Roberts testified that she was aware of the actions she needed to take to ensure that she would be paid for time worked.  On multiple occasions, Roberts used payroll adjustment forms to correct her time entries, including corrections for days when she missed lunch.  Advocate paid her for hours claimed on these adjustment forms.  When Roberts submitted a payroll adjustment form in July 2012 that covered the two week period of July 1, 2012 to July 14, 2012, she did not include all of the additional unpaid time for this time period that she now claims that she worked.

In addition to correcting time via payroll adjustment forms, Roberts was aware that she could have received payment for the alleged uncompensated overtime worked over the lunch period by making a change to her clocked time in the computer system, using the "no lunch" feature to indicate that she had worked through lunch, or going to Human Resources.  At her deposition, when asked why she did not attempt to correct her time with a payroll adjustment form, Roberts explained that "it was just busy and, you know, patients first and I just had to keep going."  (Roberts Dep. at 78:5-79:5.)  When asked if she ever notified anyone about her missed

lunches, Roberts stated that "there was a system that you could write on a piece of paper if you forgot your lunch, but it was just busy and I just forgot." (*Id*. at 51:18-52:7.) Similarly, Roberts testified that she occasionally forgot to enter the "no lunch" code when she worked through lunch. *Id*. at 50:11-21 ("[Y]ou know, sometimes you forget to – you just want to swipe out and I would forget to swipe out no lunch. The next day I come in, I hit the ground running, we are doing – we are fast, we are getting things done and, you know, the next thing I know I just forgot, you know, to swipe it out."). Prior to the filing of this lawsuit, Roberts did not attempt to correct her time records for missed or interrupted lunches or attempt to have Advocate pay her for the alleged post-shift discussions with Magurany.

Before she filed suit, Roberts complained to three co-workers (Bonnie Born, Wylanda Wynn, and Cheryl Thompson, whose job titles are not specified but who were "just people [Roberts] work[ed] with" as opposed to managers or supervisors) about her overtime pay. (*Id*. at 124:7-125:10). Roberts testified at her deposition that on a single occasion, she complained to Magurany about a day where she was paid for being on-call at the Cath Lab but worked an extra 4-hour shift in Pediatrics at the same time. Although Roberts' unpaid overtime claim in this lawsuit does not include time worked in the Pediatrics unit, Roberts believed that Magurany should have adjusted her pay upwards to reflect work performed in the Pediatric unit. (*Id*. at 125-128.) Roberts acknowledged that asking to be paid by two departments for the same shift was "unusual" and that Magurany had advised her that she could not be paid for being on-call and for working that same shift in the Pediatrics unit. (*Id*. at 128:8-12.) Roberts believed this was unfair because she could have left the Pediatrics unit to help to respond to any emergencies in the Cath Lab.

Roberts appears to be asserting that she did not tell management at Advocate about the alleged unpaid overtime at issue in this case because her conversation with Magurany about the 4-hour shift in the Pediatrics unit had a chilling effect.  *Id.* at 127:20-128:12 ("I didn't want to complain.  I'm not a complainer.  At the time, the economics were low.  I didn't want to lose my job.  So I just didn't say anything.  When I addressed it the one time, it was like, no, you're not getting paid for it, so I just took it to be like, okay, this is not something that's discussed.").  Other than this conversation with Magurany, Roberts did not tell any other supervisors, managers, or HR employees that she believed that Advocate had failed to compensate her for overtime work she had performed.

## II.  LEGAL STANDARD

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009).  A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party.  *Id.*

## III.  DISCUSSION

After Advocate terminated her employment, Roberts brought this FLSA (Count I) and IMWL (Count II) action.  Roberts claims that Advocate violated the FLSA and IMWL because it failed to pay her for 8 to 12 hours of uncompensated overtime per week, including time spent

working before and after her scheduled shift and during her lunch break.[4]  According to Roberts,

Advocate bears the burden of ensuring that employee time records are accurate so to the extent

that Advocate's records do not show time that she claims she worked, she may receive overtime

pay based on other evidence.  To carry this burden, Roberts has submitted numerous pager, text,

and email records.[5]  She contends that these records show that she performed uncompensated but

compensable work so "[t]he only actual question of fact for the jury to decide is whether the

Defendant knew or should have known that [she] was performing work without being

compensated for her time."  (Pl.'s Resp., Dkt. 34, at 8.)  She also asserts that due to the amount

of uncompensated work that she performed, Advocate knew or should have known that she was

performing uncompensated work.

In response, Advocate raises a host of challenges to the pager, text, and email records

proffered by Roberts and contends that they fail to create a factual question as to whether

Roberts performed uncompensated but compensable work.  It also argues that Roberts' claim of

unpaid overtime is largely based on her unsupported recollections.  It then argues that even if

Roberts worked the claimed overtime hours (which it disputes), it is entitled to summary

judgment because neither the FLSA nor the IMWL allows an employee to recover for overtime

work (1) if she forgot or was too busy to record the time contemporaneously or (2) when she did

---

[4]  The court will discuss the FLSA and IMWL claims together as the same analysis applies to both statutes.  *See*, *e.g.*, *Mitchell v. JCG Indus.*, 929 F. Supp. 2d 827, 833-34 (N.D. Ill. 2013) (collecting cases).

[5]  Because of the way that the parties organized the record, the total number of pager, text, and email records is unclear.  However, these records clearly are voluminous.  For example, Roberts states that she submitted more than 782 emails that were sent "off hours" in opposition to Advocate's motion for summary judgment.  (Pl. Resp. at 1.)

not notify her employer that her submitted time records were incorrect because she was working before or after her shift or during her lunch break.

"The employee bears the burden of proving that she performed overtime work for which she was not properly compensated." *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 173 (7th Cir. 2011) (citing *Anderson v. Mt. Clemens*, 328 U.S. 680, 686-87 (1946), superseded on other grounds by statute, Portal-to-Portal Act of 1947, 29 U.S.C. § 251-262); *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 691 (7th Cir. 2010). An employee who contends that her employer's records are incomplete must "produce[ ] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Turner*, 595 F.3d at 691 (quoting *Anderson*, 328 U.S. at 687); *Joiner v. Bd. of Tr. of Flavius J. Witham Mem'l Hosp.*, No. 1:13-CV-555-WTL-DKL, 2014 WL 3543481, at *6-7 (S.D. Ind. July 17, 2014) (rejecting claim of unpaid lunch breaks because "[d]espite claims of repeated interruptions, each Plaintiff is unable to state specific instances of when his meal breaks were interrupted and not compensated.").

Even if an employee can show that she performed uncompensated work or that there are fact questions about whether she did so (issues that are hotly contested in this case), the parties agree that to survive summary judgment on her FLSA and related state law claims, Roberts must also show that Advocate "had actual or constructive knowledge of her overtime work." *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011). As the Seventh Circuit has explained:

> The FLSA imposes an obligation on the employer "to exercise its control and see that the work is not performed if it does not want it to be performed." *See* 29 C.F.R. § 785.13. The employer "cannot sit back and accept the benefits without compensating for them." *Id.* "[The employer's] duty arises even where the employer has not requested the overtime be performed or does not desire the employee to work, or where the employee fails to report his overtime hours." *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 288 (2d Cir. 2008). The mere promulgation of a rule against overtime work is not enough. 29 C.F.R. § 785.13.

> Nor does the fact that the employee performed the work voluntarily necessarily take her claim outside of the FLSA. 29 C.F.R. § 785.11. However, the FLSA stops short of requiring the employer to pay for work it did not know about, and had no reason to know about. *See* 29 U.S.C. § 203(g) . . . .

*Kellar*, 664 F.3d at 177; *Gaines v. K-Five Const. Corp.*, 742 F.3d 256, 270 (7th Cir. 2014)

(because "an employer cannot slyly sit back in order to reap extra work without pay, it has no

obligation to pay for work it did not know about and had no reason to know about" so the

employee's unpaid overtime turned on whether he "presented a genuine issue of material fact as

to whether [his employer] knew that [the plaintiff] worked an extra 15 minutes on certain days").

Here, the two inquiries – whether Roberts performed uncompensated overtime work and,

if so, whether Advocate knew or should have known about this work – essentially collapse into a

single inquiry because Roberts' position is that the nature and amount of her alleged unpaid

overtime gave Advocate actual or constructive knowledge that she was working unpaid overtime

despite her failure to enter that time into Advocate's time and attendance system. In other

words, Roberts relies on the same evidence to show that she was performing uncompensated

overtime work and that Advocate knew or should have known about that work. Roberts seeks

compensation for three categories of alleged unpaid overtime: the post-shift meetings with

Magurany, skipped or interrupted lunches, and time spent addressing off-shift phone, text, and

pager communications.

**1.      Advocate's Alleged Constructive Knowledge of Unpaid Post-Shift Meetings with Magurany and Missed or Interrupted Lunches**

Roberts argues that Magurany, her supervisor, met with her for approximately thirty

minutes approximately four times each week after Roberts had clocked out. Setting aside the

parties' dispute about the frequency and length of these alleged meetings and accepting Roberts'

position as true since she is opposing summary judgment, the problem with this argument is that Roberts points to no evidence indicating that Magurany knew that during these alleged meetings, Roberts had (1) already punched out for the day and (2) would not correct her time after the fact using the mechanisms available to her.

As noted above, Magurany supervised between 45 to 50 employees in multiple departments. Roberts contends that when Magurany reviewed employee time cards, she should have noticed that Roberts' time cards did not reflect time spent at the alleged post-shift meetings. This constructive knowledge argument is speculative. It rests on three assumptions: (1) Magurany knew that Roberts was off the clock during the purported post-shift meetings; (2) Magurany knew that Roberts routinely failed to correct her time cards to reflect time spent at those meetings; and (3) when Magurany reviewed Roberts' time cards at a later date, she was able to detect that Roberts' time cards shorted Roberts for time spent at the meetings. These assumptions are not tied to any specific facts in the record. *See Gaines*, 742 F.3d at 270 (inference that employer knew that employee was working unauthorized and unpaid pre-shift overtime was unreasonable when no evidence showed that the employer was aware of the employee's "precise start time."). The fact that something is theoretically possible is not enough to create a triable issue of fact. *See Blakes*, — F. Supp. 3d at —, No. 11 C 336, 2015 WL 135028, at *19 (N.D. Ill. Jan. 9, 2015) (employee's claim that his employer had actual knowledge that he was working through lunch without compensation based on their review of his time sheets was insufficient to survive summary judgment because the claim that they "presumably should have noticed that he did not report any overtime" was speculative).

This is especially true given that Advocate had multiple mechanisms by which employees could correct their time. Roberts used these mechanisms on multiple other occasions. She also helped other employees correct their time. *See Boelk v. AT & T Teleholdings, Inc.*, No. 12-CV-40-BBC, 2013 WL 3777251, at *7 (W.D. Wis. July 19, 2013) (citing *Kellar*, 664 F.3d at 178) ("By failing to record their hours accurately and failing to tell their supervisors or managers about lunch break work, plaintiffs prevented defendants from having actual knowledge of their off the clock work.").

This reasoning applies equally to Roberts' claim that Magurany should have noticed that she was periodically working through lunch and not recording this as a skipped or interrupted lunch. *See Blakes*, 2015 WL 135028, at *13 (plaintiff who did "not present[] evidence that would have given his supervisors reason to know that he was not recording all of his work time" failed to establish actual or constructive notice of unpaid lunchtime work).

Moreover, Roberts never provided actual notice by complaining to Magurany or any other supervisor about any of the unpaid overtime she now claims that she worked. No evidence suggests that Roberts' alleged complaints to co-workers Bonnie Born, Wylanda Wynn, and Cheryl Thompson placed Advocate management on notice about Roberts' claimed unpaid overtime. Roberts' sole complaint to Magurany concerned Advocate's decision not to pay her for four hours when she was scheduled to be on-call at the Cath Lab but took an extra 4-hour shift in Pediatrics during that same shift. Magurany advised Roberts that she could not be paid for being on-call when she was simultaneously working a shift in the Pediatrics unit. This complaint has no discernable connection to the unpaid overtime claims raised in this lawsuit.

Relatedly, any argument that this conversation prevented Roberts from telling Magurany about the unpaid overtime claims raised in this case does not correspond to the cited evidence. According to Roberts, she "addressed it [being paid for being on call in the Cath [L]ab while she was working a shift elsewhere in the hospital ] the one time, it was like, no, you're not getting paid for it, so I just took it to be like, okay, this is not something that's discussed." (Roberts Dep. at 127:20-128:12.) The subjective belief that a further complaint about not being paid for two simultaneous shifts would fall on deaf ears has no bearing on whether Roberts could have complained about the alleged unpaid overtime at issue in this case. This is especially true since Roberts does not argue that Advocate would have refused to pay her if she had used one of the available mechanisms to correct her time and the uncontroverted evidence shows that Advocate paid Roberts for all of the overtime that she claimed.

Accordingly, Roberts is not entitled to a trial on the following issues: (1) whether Advocate is liable for unpaid overtime based on the post-shift meetings with Magurany; and (2) whether Advocate had actual or constructive notice that Roberts was not being paid for allegedly skipped or interrupted lunches due to Magurany's review of Roberts' time cards. The corresponding portion of Advocate's motion for summary judgment is granted.

## 2. Advocate's Alleged Constructive Knowledge of Unpaid Overtime Associated With Pager, Text, and Email Communications

Next, Roberts asserts that the extensive pager, text, and email records that are the focus of large portions of the parties' Rule 56.1 submissions show that she (1) worked unpaid overtime that (2) was of a type and quantity that placed (or should have placed) Advocate on notice. Neither side has queued up this issue in a manner that allows the court to determine if these

contentions are supported by the record because the parties's submissions are impossible to reconcile in their present form.

Roberts has deluged the court with stacks of pager, text, and email records that purportedly show that she performed compensable but unpaid overtime work.  For example, Roberts asserts that she received 782 emails outside normal working hours during the time period at issue.  She then asserts that she did not receive compensation for this time.  There is no feasible and expedient way to match these up with her pay records to see if she was paid at the relevant date and time and whether she was on-call or working a paid shift.

In addition, Roberts had a daily thirty-minute lunch break.  Nevertheless, she contends that any communications received during a three and a half hour block during which she could have taken her thirty-minute lunch support her claim that she performed unpaid compensable work during lunch.  The three and a half hour block is extremely broad and necessarily must capture communications received during normal working hours.  The use of the three and a half hour "lunch" block also means that the court cannot ascertain whether the cited communications were received during her actual thirty-minute lunch break.  These examples are illustrative.  In short, Roberts has filed a mountain of records but the court cannot ascertain if they prove what Roberts says they do.

Turning to Advocate's submissions, when Roberts provided pinpoint citations to the pager, text, and email records that purportedly support her claim for unpaid overtime, Advocate objected.  For example, Advocate asserts that Roberts submitted emails from when she was paid to be on-call, emails that Roberts responded to when she was clocked in, emails that fall into a three and a half hour block during which Roberts contends her thirty-minute lunch could have

been taken, and pages sent when Roberts was either clocked in or on call.  The greatest

concentration of these objections appears in Advocate's reply in support of its statement of facts

which, as discussed above, is not a proper filing pursuant to Local Rule 56.1.  But even if the

court considered the reply, it would not help because the court cannot readily determine if these

objections correspond to each and every record submitted by Roberts.

The size of the record does not demonstrate that a triable issue of fact exists.  *See United

States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for

truffles buried in" the record); *see also Highland Supply Co. v. Klerk's Flexible Packaging, B.V.*,

No. 05-CV-482-DRH, 2007 WL 2903047, at *4 (S.D. Ill. Sept. 27, 2007) (a "voluminous

spreadsheet comprised of indecipherable product codes, Dutch language product descriptions,

and aggregate sales figures apparently covering a six year period" was insufficient to survive

summary judgment when "Plaintiffs . . . offered the Court no assistance whatsoever in helping to

determine how these records [supported their position].").  The court thus declines to find that

there is a triable issue of fact based on the sheer number of pager, text, and email records

reflecting communications between Advocate and Roberts

"[I]t is not the role of the Court to parse the parties' exhibits to construct the facts."

*Meng v. Aramark Corp.*, No. 12 C 8232, 2015 WL 1396253, at *1 (N.D. Ill. Mar. 24, 2015).

However, a different presentation of the evidence would likely enable the court to resolve

Advocate's motion for summary judgment on the merits.  Advocate, as the moving party, should

prepare a chart (or another type of summary) of the pager, text, and email records.  It should

group the records by objection (*e.g.*, "texts sent while Roberts was clocked in," "email responses

sent by Roberts when she was on-call," etc.).  The parties are then directed to meet and confer to

narrow the issues and confirm that 100% of the pager, text, and email records are included in the chart or summary. Advocate can then renew its motion for summary judgment and make arguments based on discrete groups of records.[6] This will allow the court to determine if any of the records support Roberts' claim that she performed unpaid overtime that gave Advocate actual or constructive notice. But in the meantime, based on the present record, the court declines to reject the records out of hand without giving the parties a final chance to receive a ruling on the merits. Accordingly, the portion of Advocate's motion for summary judgment that is based on phone, text, and pager communications with Roberts is denied without prejudice. Any renewed motion for summary judgment must focus on this discrete issue.

## IV. CONCLUSION

For the reasons discussed above, Advocate's motion for summary judgment [23] is granted in part and denied without prejudice in part. Specifically, Advocate is entitled to summary judgment on Roberts' claims that: (1) Advocate is liable for unpaid overtime based on the post-shift meetings with Magurany; and (2) Advocate had actual or constructive notice that Roberts was not being paid for allegedly skipped or interrupted lunches due to Magurany's review of Roberts' time cards. The portion of Advocate's motion for summary judgment directed at Roberts' claim that phone, text, and pager communications show that she performed unpaid overtime work is denied without prejudice. A status is set for September 18, 2015, at

---

[6] The court will be receptive to suggestions about other possible formats of a re-filed summary judgment motion so long as they address the court's concerns about (1) accounting for all of the records and (2) presenting objections by group.

9:30 a.m., at which time the parties shall be prepared to update the court on the progress of their efforts to comply with this opinion and order.



Date:   August 7, 2015                    _____/s/_____
                                          Joan B. Gottschall
                                          United States District Judge